# EXHIBIT C

E-FILED
3/28/2024 3:45 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
24CV434085
Reviewed By: J. Nguyen

Robert J. Gralewski, Jr. (State Bar No. 196410)
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
Facsimile: (858) 255-7772

David E. Kovel (*pro hac vice forthcoming*)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 11077
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Attorneys for Plaintiff*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

|  |  |
|---|---|
| KYLE T. WHITESIDE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | 24CV434085<br>Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>[JURY TRIAL DEMANDED]<br><br>1. For Violation of the Cartwright Act, (California Business and Professions Code § 16720)<br>2. For Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16727)<br>3. Unfair Competition Act (Cal. Bus. & Prof. Code § 17200)<br>4. Unjust Enrichment |

COME NOW Plaintiff, on behalf of himself individually and as a representative of a class of similarly-situated iPhone purchasers throughout California, and, demanding a trial by jury, complain and allege through his attorneys on information and belief as follows:

## I. INTRODUCTION

1.      Consumers love Apple products, but Apple has exploited that love. After initially gaining a loyal following for the iPhone by creating such an impactful product that it changed the world, Apple realized it could not sustain that loyalty once the competition caught up with its once revolutionary technology. Rather than competing on the merits, Apple used anticompetitive techniques to lock consumers and developers into its ecosystem, thwart nascent competitive threats, and build a "moat" around the iPhone that would ensure monopoly profits for years to come. The U.S. Department of Justice ("DOJ") and 16 States and territories have rightly brought suit to vindicate their sovereign law-enforcement interests and stop Apple's wrongful conduct. Plaintiff now seeks in this suit to vindicate the interests of the millions of consumers who have overpaid for iPhones they purchased from Apple, missed out on the innovation and improved user experiences that competition would have made possible, and face ongoing harm unless this Court enjoins Apple's monopolistic conduct in the performance smartphone and smartphone markets.

2.      After struggling for direction in the 1990s, Apple revived its fortunes by launching the iPod digital music player in 2001. Apple developed an application, iTunes, which allowed iPod users to purchase digital copies of songs, organize their song library, and update their iPod devices. This meant that listeners no longer needed to carry hard media to listen to music on the go, and sleek iPods quickly displaced bulkier devices like portable cassette tape or compact disk players. Apple secured licensing agreements with the major labels, allowing it to offer iPod/iTunes users a wide selection of music on a fee-per- download basis. Aided by an earlier antitrust consent decree that prohibited Microsoft Corporation from interfering with distribution of iTunes on the Windows operating system as well as Apple's own Macintosh computers, the iPod experience gave Apple a recipe for the future: a high-end device, a large number of platform participants (*i.e.*, music labels and consumers), and a digital storefront.

3.      Apple saw the success of the iPod and used it to launch a business strategy that would propel it to dominance over the next two decades: drive as many consumers and third-party participants to the platform as possible and offer a wide selection of content, products, and services created by those third parties to consumers. This structure put Apple in the driver's seat to generate substantial revenues through device sales in the first instance and, in the second instance, subsequent ancillary fees that it derives from sitting between consumers on the one hand and the products and services they love on the other. This strategy also laid the foundation for Apple to launch its most successful product yet.

4.      In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software apps built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive for its users and the iPhone platform more broadly. So, Apple invited and capitalized on the work of these third parties' efforts while maintaining control and monetizing that work for itself. The value of third parties' work served an important purpose for Apple. Indeed, as early as 2010, then-CEO Steve Jobs ("Jobs") discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

5.      That strategy paid off. For more than 15 years, Apple has built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight

control over how third parties innovate and monetize on and off the smartphone in ways that were anticompetitive and exclusionary.[1]

**Apple's Ecosystem: Hardware, Software Infrastructure, Apple & Third-Party Apps**



6.       Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. When developers imagine a new product or service for iPhone consumers, Apple demands up to 30 percent of the price of an app whose content, product, or service it did not create. Then when a consumer wants to buy some additional service within that app, Apple extracts up to another 30 percent, again for something it does not create or develop. When customers buy a coffee or pay for groceries, Apple charges a fee for every "tap-to-pay" transaction, imposing its own form of an interchange fee on banks and a significant new cost for using credit cards. When users run an internet search, Google gives Apple a significant cut of the advertising revenue that an iPhone user's searches generate.

---

[1] Graphic taken from Investigation of Competition in Digital Markets, 117th Cong., CP 117-8, at 278 (Comm. Print 2020), *available at:* https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf.

CLASS ACTION COMPLAINT

7.    Apple understands that while a community of developers and accessory makers is indispensable to the success of the iPhone, they also pose an existential threat to its extraordinary profits by empowering consumers to "think different" and choose perfectly functional, less-expensive alternative smartphones.

8.    Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to force these participants to pay substantial fees. At the same time, Apple restricts its platform participants' ability to negotiate or compete down its fees through alternative app stores, in-app payment processors, and more.

9.    In order to protect that model, Apple reduces competition in the markets for performance smartphones and smartphones generally. It does this by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

10.    Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an intermediary between product creators such as developers on the one hand and users on the other.

11.    This complaint focuses on five examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple repeatedly chooses to make its products worse for consumers to prevent competition from emerging. These examples below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher

CLASS ACTION COMPLAINT

prices and less innovation for users and developers. Apple has used its anticompetitive strategies to suppress the following technologies, among others:

- Super apps provide a user with broad functionality in a single app. Super apps can function by providing a consistent user experience that can be ported across devices. Suppressing super apps harms all smartphone users, including Apple users, by denying them access to high quality experiences and it harms developers by preventing them from innovating and selling products.

- Cloud streaming game apps provide users with a way to play computing intensive games in the cloud. Cloud streaming games (and cloud streaming in general) can improve smartphone competition by decreasing the importance of expensive hardware for accomplishing high computing tasks on a smartphone and saving money for ever greater amounts of internal storage. Suppressing cloud streaming games harms users by denying them the ability to play high-compute games, and it harms developers by preventing them from selling such games to users.

- Messaging apps are apps that allow users to communicate with friends, family, and other contacts. Messaging apps that work equally well across all smartphones can improve competition among smartphones by allowing users to switch phones without changing the way they communicate with friends, family, and others. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app, by prohibiting third-party apps from sending or receiving carrier-based messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users and others who do not have iPhones. Apple also harms developers by artificially constraining the size of their user base.

- Smartwatches are an expensive accessory that typically must be paired to a smartphone. Smartwatches that can be paired with different smartphones allow users to retain their investment in a smartwatch when switching phones thereby decreasing the literal cost associated with switching from one smartphone to another, among other things. By

suppressing key functions of third-party smartwatches—including ability to respond to notifications and messages and to maintain consistent connections with the iPhone—Apple has denied users access to high performing smartwatches with preferred styling, better user interfaces and services, or better batteries, and it has harmed smartwatch developers by decreasing their ability to innovate and sell products.

- Digital wallets are an increasingly important way that smartphones are used and are a product in which users develop a great deal of comfort and trust as they typically contain users' most sensitive information. Digital wallets that work across smartphone platforms allow users to move from one smartphone brand to another with decreased frictions, among other things. Apple has denied users access to digital wallets that would have provided a wide variety of enhanced features and denied digital wallet developers—often banks—the opportunity to provide advanced digital payments services to their own customers.

12.    By maintaining its monopoly over smartphones, Apple is able to harm consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated by forcing users to use only Apple- authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

13.    Apple wraps itself in a cloak of privacy, security, and alleged consumer preferences to justify its anticompetitive conduct. Indeed, it spends billions on marketing and branding in order to promote the self-serving premise that only Apple can safeguard consumers' privacy and security interests. Apple selectively compromises privacy and security interests when doing so is in Apple's own financial interest—such as degrading the security of text messages, offering governments and certain companies the chance to access more private and secure versions of app stores, or accepting

billions of dollars each year for choosing Google as its default search engine when more private options are available. In the end, Apple deploys privacy and security justifications as an elastic shield that can stretch or contract to serve Apple's financial and business interests.

14.     Of course, this is not the story Apple presents to the world. For decades, Apple branded itself as a nimble, innovative upstart. In 1998, Apple co-founder Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the DOJ" in hopes of getting Microsoft "to play fair." But even at that time, Apple did not face the same types of restrictions that it imposes on third parties today; Apple consumers could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each song downloaded from Apple's iTunes store. Indeed, users could download iTunes and use it on their computers (including computers running Microsoft Windows) without owning an iPod at all. Similarly, when Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

15.     The most immediate and obvious costs of Apple's anticompetitive conduct directly affect Apple's own customers: Apple inflates the price for buying and using iPhones while preventing the development of features like alternative app stores, innovative super apps, cloud-streaming games, and secure texting that would drive consumer value, innovation, and improved user experience. Plaintiff and other class members have borne these harms and will continue to experience them unless this Court stops Apple's monopolistic conduct through an injunction. These direct purchasers of iPhones from Apple have overpaid because of the anticompetitive effects of Apple's behavior, and they deserve to recover their full treble damages allowed under California law as well as to obtain an injunction to prevent future injuries due to Apple's antitrust violations.

16.     Because Apple's conduct harms the competitive process, moreover, the harms from that conduct flow even more widely, affecting all smartphone consumers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, like digital wallets, because they cannot reach iPhone users. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market

never get off the ground. Indeed, Apple itself has less incentive to innovate due to the reduced competitive pressures it faces. Moreover, Apple has demonstrated its ability to use its smartphone monopoly to impose fee structures and manipulate app review to inhibit aggrieved parties from taking advantage of regulatory and judicial solutions imposed on Apple that attempt to narrowly remedy harm from its conduct. So punishing and restraining the conduct in this case will not only benefit the members of the proposed Class, but also further the interests of all smartphone purchasers as well as developers and others harmed by Apple's behavior.

17.    Apple's executives openly acknowledge the way that Apple's conduct dulls its incentive to innovate: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue we're already doing *more* than what would have been good enough. But we find it very hard to regress our product features YOY [year over year]." Existing features "would have been good enough today if we hadn't introduced [them] already," and "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone." Thus, it is not surprising that Apple spent more than twice as much on stock buybacks and dividends as it did on research and development.

18.    Smartphones have so revolutionized American life that it can be hard to imagine a world beyond the one that Apple, a self-interested monopolist, deems "good enough." But under our system of antitrust laws, "good enough" is, quite simply, not enough. Consumers, competition, and the competitive process—not Apple alone—should decide what options consumers should have. And competition, not Apple's self-interested business strategies, should be the catalyst for innovation essential to our daily lives. Competition is what will ensure that Apple's conduct and business decisions do not thwart the next Apple to arrive on the scene. Plaintiff therefore brings this case to rid smartphone markets of Apple's exclusionary conduct, secure just compensation for the consumers most directly impacted by that conduct, and ensure that the next generation of innovators can upend the technological world as we know it with new and transformative technologies.

## II.    PARTIES

### A.    Plaintiff

19.     Plaintiff Kyle T. Whiteside is a resident of San Diego, California. Plaintiff Whiteside purchased a new iPhone 13 in approximately July 2021 from Apple's retail store, located in North County Mall, Escondido, California.

### B.    Defendant Apple

20.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In its 2023 fiscal year, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

21.     Apple's iPhone forms the core of its business and has done so for over a decade. Sales of iPhone devices have accounted for a majority of Apple's revenue in every year since 2012, and the devices regularly carry profit margins in excess of 30%. These margins far exceed those of competing devices, and they have been essential to Apple's financial performance in recent years. For example, in the years 2017-2019, iPhone sales dominated Apple's revenue:



9

22.     Each iPhone sale guarantees revenue streams well beyond the initial purchase price. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (*e.g.*, Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (*e.g.*, tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services. Apple's U.S. market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade.

23.     Industry observers have credited Apple's present and future valuation to its successful focus on growing the Services business. Apple itself has attributed the growth of Services as a driver of its profits from sales and a significant factor supporting Apple's overall margins as hardware sales slowed or declined. Apple has consistently credited the App Store, licensing sales, and AppleCare, among others, for the success of Services. Apple's monopolization of the performance smartphone and smartphone markets thus helps it cultivate the "walled garden" that sustains its broad extraction of monopoly rents.

24.     Apple's smartphone market shares understate its dominance and likely growth in key demographics, including among younger American consumers. For example, one-third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone. iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to access related

10

products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.

25.     In its fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $77 billion on stock buybacks during the same year.

**III.     JURISDICTION AND VENUE**

26.     This Complaint is filed pursuant to California Business and Professions Code sections 16720, *et seq.*, commonly known as the Cartwright Act. Under California Business and Professions Code section 16750(a), Plaintiff seeks to recover treble the damages Plaintiff and the members of the Class have sustained due to Defendant's illegal activities.

27.     Venue is proper in Santa Clara County under California Business and Professions Code section 16750(a), and California Code of Civil Procedure section 395.5. First, Defendant Apple's principal place of business is in Santa Clara County. Second, members of the Class purchased iPhones in Santa Clara County.

28.     The amount in controversy for the individual Plaintiff and for each Class member is less than $75,000 per Plaintiff.

29.     No portion of this Complaint is brought pursuant to federal law.

30.     All the members of the proposed Class are citizens of the State of California. Class Plaintiff seeks significant relief from Defendant Apple Corporation, which is headquartered in, and has its principal place of business in California. The relief sought by Plaintiff is sought exclusively from Defendant Apple Corporation and the injuries to Plaintiff resulting from the misconduct alleged herein were incurred in the State of California. During the three (3) year period preceding the filing of this action, no other class action was filed asserting similar allegations against Defendant Apple on behalf of the same class of persons. Apple is the primary Defendant and its conduct as alleged herein forms a significant basis for the claims asserted by the proposed Plaintiff Class.

1    **IV.    RELEVANT FACTS**

2         **A.    Apple launches the iPod, iTunes, and the iTunes Store.**

3         31.    In January 2001, Apple introduced iTunes, software built on Apple's QuickTime

4    architecture, and advertised it as "Jukebox Software" for organizing and listening to music. The

5    initial version of iTunes was only compatible with Apple's Mac computers.

6         32.    Later that same year, Apple debuted the iPod, a portable digital audio player that

7    worked alongside iTunes to "let[] you put your entire music collection in your pocket and listen to

8    it wherever you go." Like iTunes, the initial iPod was only compatible with Mac computers.

9         33.    On November 1, 2002, the U.S. District Court for the District of Columbia accepted

10   a proposed consent decree in *United States v. Microsoft Corp.*, Civil Action No. 98-1232 & 98-

11   1233 (TPJ) (D.D.C.). Among other things, the consent decree prohibited Microsoft from retaliating

12   against companies for developing or distributing products such as browsers and media players. The

13   consent decree also required Microsoft to make various APIs available to third- party developers,

14   including Apple.

15        34.    Following that consent decree, in October 2003, Apple launched a cross-platform

16   version of iTunes that was compatible with the Windows operating system. As a result, a much

17   larger group of users could finally use the iPod and iTunes, including the iTunes Store. The iTunes

18   Store allowed users to buy and download music and play it on their iTunes computer application

19   or on the iPod. Apple benefited substantially from this new customer base. In the first two years

20   after launching the iPod, Apple sold a few hundred thousand devices. The year after launching a

21   Windows-compatible version of iTunes and gaining access to millions more customers, Apple sold

22   millions of devices. Apple went on to sell hundreds of millions of iPod devices over the next two

23   decades. Moreover, iTunes became the market leader in online music services. At an event in 2007,

24   Apple's then-CEO, Steve Jobs, said of the iPod, "it didn't just change the way we all listened to

25   music, it changed the entire music industry." At the same event, he announced that the company

26   would change its name from Apple Computer, Inc. to Apple, Inc. in light of its shifting focus to

27   consumer electronics rather than computers.

28

35.     The ubiquity of iPod and iTunes on Windows, in part because of a successful antitrust enforcement action against Microsoft, contributed to the development and success of Apple's next flagship product—the iPhone. But after launching the iPhone, Apple began stifling the development of cross-platform technologies on the iPhone.

36.     In January 2007, Apple debuted the first-generation iPhone, describing the device as "an iPod, a phone, and an internet communicator," and touting the fact that users could "sync[] content from a user's iTunes library on their PC or Mac." Apple marketed the iPhone as a smartphone that was easy to use. Reflecting on the company's learning from the iPod, Jobs announced, "iTunes is going to sync all your media to your iPhone—but also a ton of data. Contacts, calendars, photos, notes, bookmarks, email accounts."

37.     The original iPhone cost approximately $299—approximately $450 in 2024 dollars adjusted for inflation—with a two-year contract with a phone carrier.

38.     The iPhone wasn't the first "smartphone"—that distinction is typically granted to Research in Motion ("RIM"), which launched the Blackberry in 2002. The year the iPhone launched, RIM sold 9 million blackberries. But the iPhone improved substantially on the blackberry, which was marketed predominantly to business people rather than consumers. The iPhone had its now ubiquitous touch-screen, camera, and a consumer-friendly interface that allowed it to make inroads with the consumer market that Blackberry had not tried to, or couldn't reach.

39.     At launch, nearly all native apps for the iPhone were created by Apple. There were only about a dozen apps overall, including Calendar, Camera, Clock, Contacts, iPod, Messages, Notes, Phone, Photos, Safari, Stocks, Voice Memos, and Weather. Within a year of launching the iPhone, Apple invited third-party developers to create native apps for the iPhone. Apple released its first software development kit—essentially the digital tools for building native apps on Apple's operating system (iOS)—to encourage and enable third-party developers to create native apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third- party apps provide to iPhone users with the trademarked slogan: "There's an app for that."

40.     Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares—over 70 percent of the performance smartphone market and over 65 percent of the broader smartphone market—likely understate its monopoly power today.

41.     While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives understand that third-party products and services can, in their own words, be "fundamentally disruptive" to its smartphone monopoly, decreasing users' dependence on Apple and the iPhone and increasing competitive pressure on Apple. Apple therefore willingly sacrifices the short- term benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**B.     Apple invites third-party investment on the iPhone and then imposes tight self-preferencing controls on app creation and app distribution.**

42.     Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute native iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power over developers by imposing contractual restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines. Under these guidelines, Apple has sole discretion to review and approve all apps and app updates. Apple selectively exercises that discretion to its own benefit, deviating from or changing its guidelines when it suits Apple's interests and allowing Apple executives to control app reviews and decide whether to approve individual apps or updates. Apple often enforces its App Store rules arbitrarily. And it frequently uses App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

43.     Apple also controls app creation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide native apps on the

iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement ("DPLA"). That agreement requires developers to use public APIs only "in the manner prescribed by Apple." It also prohibits third-party apps from using APIs that Apple designates as "private." Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third- party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

44.     Developers cannot avoid Apple's control of app distribution and app creation by making web apps—apps created using standard programming languages for web-based content and available over the internet—as an alternative to native apps. Many iPhone users do not look for or know how to find web apps, causing web apps to constitute only a small fraction of app usage. Apple recognizes that web apps are not a good alternative to native apps for developers. As one Apple executive acknowledged, "[d]evelopers can't make much money on the web." Regardless, Apple can still control the functionality of web apps because Apple requires all web browsers on the iPhone to use WebKit, Apple's browser engine—the key software components that third-party browsers use to display web content.

45.     Nor can developers rely on alternative app stores even though this would benefit developers and users. For example, developers cannot offer iPhone users an app store that only offers apps curated for use by children, which would provide opportunities to improve privacy, security, and child safety. By contrast, Apple allows certain enterprise and public sector customers to offer versions of app stores with more curated apps to better protect privacy and security.

46.     Apple's complete control over both app distribution and app creation gives Apple tremendous power. For example, Apple designates as "private" the APIs needed to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but

even if they did, doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes functionality that Apple does not like, Apple can and does exercise its discretion to simply block the app from the App Store.

47.     Apple has a history of shutting down rival apps. Apple once removed 11 of the 17 most downloaded apps that helped parents limit their children's time on Apple devices, which compete with Apple's own parental control app. Apple had claimed these apps could violate user privacy and security. A month later, Apple abruptly reversed this policy, but small businesses who developed these apps lost millions of dollars following Apple's purge, some of which completely shut down as a result. Apple's rival screen time control tools require the whole family to own iPhones, cementing Apple's dominance over more-beneficial tools from third-party apps to control children's access to iPhones.

48.     Apple restricts competitor apps in ways it does not restrict itself. For example, Apple has prohibited third-party music from being used with Siri, prevented third-party messaging apps from becoming Siri defaults, and copied third-party apps, often referred to as "Sherlocking".

49.     Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services. Instead, Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and pressure those participants pose to Apple's smartphone monopoly.

50.     These policies hurt consumers. As one developer has explained, "[T]he more money Apple takes from developers, the fewer resources developers have. When developers have to cut costs, they stop updating apps, skimp on customer support, put off hiring a graphic designer, etc. They decide not to make apps at all that they might have made were it easier to be profitable."

51.     Apple's own documents corroborate this conclusion. According to the DOJ's Complaint, Apple's senior executives have acknowledged that the requirement to use Apple's in-app payment ("IAP") system stifles competition and limits the apps available to Apple's customers. In one email conversation with other senior leaders at Apple about whether to require use of Apple's in-app IAP for e-Book purchases, Jobs said that "I think this is all pretty simple—iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things."

52.     Indeed, Apple has run the App Store like an erratic despot. The introductory section of its App Store Guidelines states that Apple can create new rules at any time and explains "[w]e will reject apps for any content or behavior that we believe is over the line. What line, you ask? Well as a Supreme Court Justice once said, 'I'll know it when I see it.' And we think that you will also know it when you cross it." According to the DOJ's Complaint, one developer has gone on record that "[i]t's complete tyranny, and the rules are often interpreted differently by different reviewers because they're intentionally left vague. So we live in constant fear we may have violated these vague rules, and that the next update to our applications will be blocked by Apple. There are countless examples where developers large and small have been denied access to publish their applications without explanation for days or even weeks at a time. It's insufferable." Another developer described Apple's Guidelines as being "arbitrarily interpreted," and a third called it "opaque and arbitrary."

53.     Some of Apple's own ex-employees agree with this assessment. Phillip Shoemaker, former director of app review for the App Store, concurred that the App Store rules were often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors." He noted that "Apple has complete and unprecedented power over their customers' devices. The decisions they make with regards to third-party apps needs to be above reproach, and currently are not."

54.     This is the antithesis of innovation. Apple pilfers ideas developed by others, claims them as its own and then boots the inventors from its App Store in order to avoid competition.

1    Consumers suffer as a result. Through its control over the iPhone and the iOS ecosystem it runs on,

2    Apple has come to dominate the performance smartphone and smartphone markets. It uses its

3    dominance to impose contracts and rules that restrict the behavior and design decisions of

4    companies other than Apple and thereby injures its own customers.

5           55.    This dominance has allowed Apple to extract enormous profits. As one press report

6    related:

7           Apple said Monday [January 10, 2022] that it paid developers $60 billion in 2021, or $260
            billion total since the App Store launched in 2008. It's a figure that suggests App Store sales
8           continue to grow at a rapid clip. By comparison, Apple said in 2019 it had paid developers
            a total of $155 billion since 2008. And at the end of 2020, it said it had paid $200 billion,
9           an increase of $45 billion. Monday's figures show a jump of $60 billion.

10          ***

11          If Apple's commissions were uniformly at 30%, it grossed $85.71 billion in App Store sales
            in 2021 at the highest, based on CNBC analysis. If Apple's commissions were all 15%, it
12          would come in lower, at $70.58 billion. Last year, CNBC analysis suggested that Apple's
            App Store grossed more than $64 billion in 2020, based on a 30% commission rate. . . .
13

14   **V.     THE ECONOMICS OF THE SMARTPHONE PLATFORM**

15          56.    Smartphones combine the functionality of a traditional mobile phone with advanced

16   hardware and software components. This cluster of services and features results in a distinct product

17   for consumers and developers. For example, smartphones not only make phone calls, but also allow

18   users to listen to music, send text messages, take pictures, play games, access software for work,

19   manage their finances, and browse the internet.

20          57.    Smartphones are platforms. Platforms bring together different groups that benefit

21   from each other's participation on the platform. A food delivery app, for example, is a multi-sided

22   platform that brings together restaurants, couriers, and consumers. A two-sided platform, for

23   example, may bring together service providers on the one hand and consumers on the other. The

24   technology and economics of a smartphone platform are fundamentally different from the

25   technology and economics of a simultaneous transaction platform, such as a credit card, because

26   smartphone platforms compete over device features and pricing in ways that do not directly relate

27   to app store transactions. Whereas credit card transactions reflect a single simultaneous action that

28   requires both sides of the transaction for either side to exist, consumers value smartphone platforms

for a variety of reasons separate from their ability to facilitate a simultaneous transaction. Consumers care about non-transactional components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

58.     The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. In order to create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were only opened to third parties when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

59.     Apple pre-installs dozens of Apple apps in its iPhones. Several of these apps are set as defaults and are "operating system apps" that are "integrated into the phone's core operating system and part of the combined experience of iOS and iPhone." Apple does not pre-install any third-party apps, and until the September 2020 release of iOS 14, it did not allow consumers to select third-party web browser or email apps as defaults. Regulators in Europe have noted that "pre-installation of apps can create a so-called status-quo bias. Consumers are more likely to use the apps that are pre-installed on their smartphones." Consumers are likely to download apps that compete with pre-installed apps only when there is an obvious quality difference, and even then, lower-quality pre-installed apps will still enjoy an advantage over third party apps.

60.     Likewise, it has been noted that "private APIs have the potential to give Apple apps a competitive advantage," and that "Apple has for a long time favored its own services through APIs." As an example, when someone using an Apple device clicks on a website link, the webpage opens in Apple's Safari browser. Until the September 2020 release of iOS 14, Apple did not allow consumers to select third party web browsers as a default. This was unique to iOS. No other mobile device operating system had a similar limitation.

61.     Siri, Apple's voice assistant, illustrates the issues. It has been described by one developer as a "closed" intelligent virtual assistant that limits the types of voice interactions voice app developers have access to. The app developer explained that Sirikit, which allows iOS apps to work with Siri, relies on a preordained list of basic interactions that third parties can use, such as messaging, calling, payments, etc. This very limited set of interactions makes it impossible to launch an app for the third party's services, including applications that compete with an Apple service. Among many users of Siri, it is regarded as stunningly deficient, compared, for example, to Amazon's Alexa.

62.     As another example, Apple's policies require alternative browser apps for iOS to use its WebKit browser engine. Consequently, all competing web browser companies must rebuild their product to make it available for iOS users. Additionally, browser engines are used in other applications that link to web content, such as email applications. According to the DOJ's Complaint, market participants are on record as saying that these guidelines cost significant internal resources and create a hurdle for market entry on iOS. These requirements also make alternative browsers on iOS less differentiated from Safari. Market participants have also noted that because Apple requires the use of WebKit, as opposed to allowing developers their own option, WebKit has become slower to innovate and adopt industry standards.

63.     This reconfirms a key point made above. Apple is often not an innovator, but instead pilfers good ideas from independent developers and then evicts them from its App Store. Jobs once said of Apple that "[w]e have always been shameless about stealing great ideas." He was right. The Washington Post has reported that "Developers have come to accept that, without warning, Apple can make their work obsolete by announcing a new app or feature that uses or incorporates their

ideas. Some apps have simply buckled under the pressure, in some cases shutting down. They generally don't sue Apple because of the difficulty and expense in fighting the tech giant—and the consequences they might face from being dependent on the platform."

64.     Similarly, Blix, the developer of an e-mail management app, has said that "Apple frequently takes other companies' innovative features, adds those ideas to Apple's own software products without permission, and then either ejects the original third-party application from the App Store (as it did with Blix's software) or causes the third-party software developer to close its doors entirely." This theme was echoed by the developer Match Group, which said that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app.

65.     Mr. Shoemaker again confirms this practice. He has stated that during his time at Apple, an app developer proposed an innovative method of wirelessly synching iPhones and Macs. The proposed app complied with Apple's guidelines, but was nonetheless rejected from the App Store. Apple then stole the rejected app's feature for its own use.

66.     In sum, limiting the features and functionality created by third-party developers— and therefore available to iPhone users—makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do so, such as protecting its monopoly profits. Such monopoly profits, and the manner in which Apple obtains them, harm consumers, Plaintiff, and the Class.

## VI.    APPLE UNLAWFULLY MAINTAINS ITS MONOPOLY POWER

### A.    Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution.

67.     According to the DOJ's Complaint, recently disclosed statements from Apple's internal documents show that, soon after the iPhone's introduction and notwithstanding its success, the company began to fear that disintermediation of its platform and the commoditization of the iPhone would threaten Apple's substantial profits from iPhone sales and related revenue streams.

21

68.     Accordingly, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products, and services. Apple often claims these rules and restrictions are necessary to protect user privacy or security, but Apple's internal discussions tell a different story. In reality, Apple imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its iPhone platform fees and/or for the importance of the iPhone platform itself. In this way, Apple acts both as an umpire and player, blocking or impairing competition.

69.     Three aspects of Apple's efforts to protect and exploit its smartphone monopoly are worth noting. *First*, Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple influences the direction of innovation both on and off the iPhone.

70.     *Second*, Apple drives iPhone users away from products and services that compete with or threaten Apple. In doing so, Apple increases the cost and friction of switching from the iPhone to another smartphone and generates extraordinary profits through subscription services (like Apple's proprietary music, gaming, cloud storage, and news services), advertisements within the App Store, and accessories like headphones and smartwatches.

71.     *Third*, Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. For most of the last 15 years, Apple collected a tax in the form of a 30 percent commission on the price of any app downloaded from the App Store, a 30 percent tax on in-app purchases, and fees to access the tools needed to develop iPhone native apps in the first place. While Apple has reduced the tax it collects from a subset of developers, Apple still extracts 30 percent from many app makers. Apple also generates substantial and increasing revenue by charging developers to help users find their apps in the App Store—something that, for years, Apple told developers was part of the reason they paid a 30 percent tax in the first place. For example, Apple will sell keyword searches for an app to someone other than the owner of the app. Apple is able to command these rents from companies of all sizes, including some of the largest and most sophisticated companies in the world. In fact, Apple has

1  recently settled litigation for approximately $100 million over its monopoly rents in app fees from
2  the 30 percent commission in a suit brought by app developers.

3      72.    As Apple exercised its control of app distribution and app creation, it slowed its own
4  iPhone innovation and extracted more revenue and profit from its existing customers through
5  subscriptions, advertising, and cloud services. These services increase the cost of switching from
6  the iPhone to another smartphone because many of these services—including its proprietary
7  gaming, cloud storage, and news service—are exclusive to the Apple ecosystem, causing
8  significant frictions for iPhone users who try to use alternative services on another smartphone.
9  Moreover, Apple's conduct demonstrates that Apple recognized the importance of digital products
10 and services for the success of the iPhone while at the same time it restricted the development and
11 growth of non-iPhone products and services—especially those that might make it easier for users
12 to switch from the iPhone to another smartphone.

13     73.    Each step in Apple's course of conduct built and reinforced the moat around its
14 smartphone monopoly. The cumulative effect of this course of conduct has been to maintain and
15 entrench Apple's smartphone monopoly at the expense of the users, developers, and other third
16 parties who helped make the iPhone what it is today. Despite major technological changes over the
17 years, Apple's power to control app creation and distribution and extract fees from developers has
18 remained largely the same, unconstrained by competitive pressures or market forces. The fact that
19 this conduct is impervious to competition reflects the success of Apple's efforts to create and
20 maintain its smartphone monopoly, the strength of that monopoly, and the durability of Apple's
21 power.

22     74.    Apple's monopoly maintenance has taken many forms and continues to evolve
23 today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its
24 contractual rules and restrictions targeting several products and services: super apps, cloud
25 streaming apps, messaging apps, smartwatches, and digital wallets. By stifling these technologies,
26 and many others, Apple reinforces the moat around its smartphone monopoly not by making its
27 products more attractive to users, but by discouraging innovation that threatens Apple's smartphone
28 monopoly or the disintermediation of the iPhone. Apple continues to expand and shift the scope

and categories of anticompetitive conduct such that the cumulative anticompetitive effect of Apple's conduct is even more powerful than that of each exclusionary act standing alone.

          **1.**      **Super Apps: Apple prevents apps from threatening its smartphone monopoly by undermining programs that reduce user dependence on the iPhone.**

75.    For years, Apple denied its users access to a class of apps that facilitate functionality across different platforms—often called "super apps"—because it viewed them as "fundamentally disruptive" to "existing app distribution and development paradigms" and ultimately Apple's monopoly power. Apple feared super apps because it recognized that as they become popular, "demand for iPhone is reduced." So, Apple used its control over app distribution and app creation to effectively prohibit developers from offering super apps instead of competing on the merits.

76.    A super app is an app that can serve as a platform for smaller "mini" programs developed using programming languages such as HTML5 and JavaScript. By using programming languages standard in most web pages, mini programs are cross-platform, meaning they work the same on any web browser and on any device. Developers can therefore write a single mini program that works whether users have an iPhone or another smartphone.

77.    Super apps can provide significant benefits to users. For example, a super app that incorporates a multitude of mini programs might allow users to easily discover and access a wide variety of content and services without setting up and logging into multiple apps, not unlike how Netflix and Hulu allow users to find and watch thousands of movies and television shows in a single app. As one Apple executive put it, "who doesn't want faster, easier to discover apps that do everything a full app does?" Restricting super apps makes users worse off and sacrifices the short-term profitability of iPhones for Apple.

78.    Super apps also reduce user dependence on the iPhone, including the iOS operating system and Apple's App Store. This is because a super app is a kind of middleware that can host apps, services, and experiences without requiring developers to use the iPhone's APIs or code.

79.    As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. Eventually, users become more willing to choose a different smartphone because they can access the same interface, apps, and content they desire on any

smartphone where the super app is also present. Moreover, developers can write mini programs that run on the super app without having to write separate apps for iPhones and other smartphones. This lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers, and reduces switching costs.

80.     Apple recognizes that super apps with mini programs would threaten its monopoly. According to the DOJ's Complaint, as one Apple manager observed, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." Why? Because when a super app offers popular mini programs, "iOS stickiness goes down."

81.     Apple's fear of super apps is based on first-hand experience with enormously popular super apps in Asia. Apple does not want U.S. companies and U.S. users to benefit from similar innovations. For example, according to the DOJ's Complaint, in a Board of Directors presentation, Apple highlighted the "[u]ndifferentiated user experience on [a] super platform" as a "major headwind" to growing iPhone sales in countries with popular super apps due to the "[l]ow stickiness" and "[l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[] usage of native OS and apps resulting in commoditization of smartphone hardware."

82.     Apple did not respond to the risk that super apps might disrupt its monopoly by innovating. Instead, Apple exerted its control over app distribution to stifle others' innovation. Apple created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs. Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

83.     In particular, part of what makes super apps valuable to consumers is that finding and using mini programs is easier than using an app store and navigating many separate apps, passwords, and set-up processes. Instead of making mini program discovery easy for users, however, Apple made it nearly impossible.

84.    Since at least 2017, Apple has arbitrarily imposed exclusionary requirements that unnecessarily and unjustifiably restrict mini programs and super apps. For example, Apple required apps in the United States to display mini programs using a flat, text-only list of mini programs. Apple also banned displaying mini programs with icons or tiles, such as descriptive pictures of the content or service offered by the mini program. Apple also banned apps from categorizing mini programs, such as by displaying recently played games or more games by the same developer. These restrictions throttle the popularity of mini programs and ultimately make the iPhone worse because it discourages developers from creating apps and other content that would be attractive to iPhone users.

85.    Apple also selectively enforced its contractual rules with developers to prevent developers from monetizing mini programs, hurting both users and developers. For example, Apple blocked mini programs from accessing the APIs needed to implement Apple's IAP system—even if developers were willing to pay Apple's monopoly tax. Similarly, Apple blocked developers' ability to use in-app payment methods other than directly using IAP. For instance, super apps could create a virtual currency for consumers to use in mini programs, but Apple blocked this too. Apple, however, allows other, less-threatening apps to do so.

86.    Apple has thus leveraged its power over the App Store to require developers to implement IAP or risk being excluded. Then-Apple CEO Steve Jobs once explained, "there will be some roadkill because of it. I don't feel guilty" when he was confronted with developer complaints about Apple's commission and requirement to use IAP.

2.    **Cloud Streaming Apps: Apple prevents developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware.**

87.    For years, Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because this would threaten its monopoly power. In Apple's own words, it feared a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device" that "works fine." Apple's conduct made its own product worse because consumers missed out on apps and content.

88.     This conduct also cost Apple substantial revenues from third-party developers. At the same time, Apple also made other smartphones worse by stifling the growth of these cross-platform apps on other smartphones. Importantly, Apple prevented the emergence of technologies that could lower the price that consumers pay for iPhones.

89.     Cloud streaming apps let users run a computationally intensive program without having to process or store the program on the smartphone itself. Instead, a user's smartphone leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

90.     Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud streamed games may be more willing to switch from an iPhone to a smartphone with less expensive hardware because both smartphones can run desirable games equally well.

91.     Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple operating systems, cloud platforms can act as middleware that allow developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

92.    Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud gaming subscription services as a native app on the iPhone. Even today, none are currently available on the iPhone.

93.    For years, Apple imposed the onerous requirement that any cloud streaming game— or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for players or developers.

94.    Until recently, Apple would have required users to download cloud streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud streaming apps so unattractive to users that no developer designed one for the iPhone.

95.    Apple undermines cloud gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and necessitating game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with several operating systems, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone.

96.    Cloud streaming apps broadly speaking—not just gaming—could force Apple to compete more vigorously against rivals. As one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the

iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming," but applies to "a number of high-compute requirement applications."

        **B.**     **Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition.**

              **1.**     **Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones.**

97.   Apple undermines cross-platform messaging to reinforce "obstacle[s] to iPhone families giving their kids Android phones." Apple could have made a better cross-platform messaging experience itself by creating iMessage for Android but concluded that doing so "will hurt us more than help us." Apple therefore continues to impede innovation in smartphone messaging, even though doing so sacrifices the profits Apple would earn from increasing the value of the iPhone to users, because it helps build and maintain its monopoly power.

98.   Messaging apps allow smartphone users to communicate with friends, family, and other contacts and are often the primary way users interact with their smartphones. In Apple's own words, messaging apps are "a central artery through which the full range of customer experience flows."

99.   Smartphone messaging apps operate using "protocols," which are the systems that enable communication and determine the features available when users interact with each other via messaging apps.

100.   One important protocol used by messaging apps is SMS.[2] SMS offers a broad user network, but limited functionality. For example, all mobile phones can receive SMS messages, but SMS does not support modern messaging features, such as large files, edited messages, or reactions like a "thumbs up" or a heart.

---

[2] Following industry practice, throughout this complaint, "SMS" refers to both SMS and MMS ("multimedia messaging service"). MMS is a companion protocol to SMS that allows for group messages and messages with basic multimedia content, such as small file sharing.

101.    Many messaging apps—such as WhatsApp, Facebook Messenger, and Signal—use proprietary, internet-based protocols, which are sometimes referred to as OTT ("over the top") protocols. OTT messaging typically involves more secure and advanced features, such as encryption, typing indicators, read receipts, the ability to share rich media, and disappearing or ephemeral messages. While all mobile phones can send and receive SMS messages, OTT only works between users who sign up for and communicate through the same messaging app. As a result, a user cannot send an OTT message to a friend unless the friend also uses the same messaging app.

102.    Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app that combines SMS functionality with Apple's OTT messaging system, iMessage. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users. For example, Apple designates the APIs needed to implement SMS as "private," meaning third-party developers have no technical means of accessing them and are prohibited from doing so under Apple's contractual agreements with developers. As a result, third- party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT messaging. Instead, if a user wants to send somebody a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send somebody a message, they just type their phone number into the "To:" field and send the message because Apple Messages incorporates SMS and OTT messaging.

103.    Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.

104.    If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers—as they have already done on Android.

105.    Moreover, messaging apps benefit from significant network effects—as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third- party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

106.    Recently, Apple has stated that it plans to incorporate more advanced features for cross-platform messaging in Apple Messages by adopting a 2019 version of the RCS (Rich Communications Services) protocol (which combines aspects of SMS and OTT). Apple has not done so yet, and regardless it would not cure Apple's efforts to undermine third-party messaging apps because third-party messaging apps will still be prohibited from incorporating RCS just as they are prohibited from incorporating SMS. Moreover, the RCS standard will continue to improve over time, and if Apple does not support later versions of RCS, cross-platform messaging using RCS could soon be broken on iPhones anyway.

107.    In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones. For example, if an iPhone user messages a non-iPhone user in Apple Messages—the default messaging app on an iPhone—then the text appears to the iPhone user as a green bubble and incorporates limited functionality: the conversation is not encrypted, videos are pixelated and grainy, and users cannot edit messages or see typing indicators. This signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse—even though Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience

31

1    social stigma, exclusion, and blame for "breaking" chats where other participants own iPhones.

2    This effect is particularly powerful for certain demographics, like teenagers—where the iPhone's

3    share is 85 percent, according to one survey. This social pressure reinforces switching costs and

4    drives users to continue buying iPhones—solidifying Apple's smartphone dominance not because

5    Apple has made its smartphone better, but because it has made communicating with other

6    smartphones worse.

7         108.    Apple recognizes that its conduct harms users and makes it more difficult to switch

8    smartphones. For example, in 2013, Craig Federighi, Apple's Senior Vice President of Software

9    Engineering explained that supporting cross-platform OTT messaging in Apple Messages "would

10   simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In

11   March 2016, Phil Schiller, Apple's Senior Vice President of Worldwide Marketing forwarded an

12   email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more

13   than help us."

14        109.    In 2022, Apple's CEO Tim Cook was asked whether Apple would fix iPhone-to-

15   Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I

16   can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."

17        110.    Recently, Apple blocked a third-party developer from fixing the broken cross-

18   platform messaging experience in Apple Messages and providing end-to-end encryption for

19   messages between Apple Messages and Android users. By rejecting solutions that would allow for

20   cross-platform encryption, Apple continues to make iPhone users' less secure than they could

21   otherwise be.

22              **2.      Smartwatches: Apple protects its smartphone monopoly by impeding
                         the development of cross-platform smartwatches.**
23

24        111.    Apple uses smartwatches, a costly accessory, to prevent iPhone customers from

25   choosing other phones. Having copied the idea of a smartwatch from third-party developers, Apple

26   now prevents those developers from innovating and limits the Apple Watch to the iPhone to prevent

27   a negative "impact to iPhone sales."

28

112.    Smartwatches are wrist-worn devices with an interactive display and accompanying apps that let users perform a variety of functions, including monitoring health data, responding to messages and notifications, performing mobile payments, and, of course, telling time. Smartwatches must generally be paired with a smartphone to operate and unlock their full functionality, such as receiving and responding to emails and text messages or answering phone calls. Because of the significant cost of buying a smartwatch, users are less willing to choose a smartphone if it is not compatible with their smartwatch.

113.    Apple's smartwatch—Apple Watch—is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that user to purchase a different kind of smartphone because doing so requires the user to abandon their costly Apple Watch and purchase a new, Android-compatible smartwatch.

114.    By contrast, cross-platform smartwatches can reduce iPhone users' dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone (or vice versa) by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch, *e.g.*, by accessing apps from their smartwatch instead of their smartphone, users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

115.    Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, in a 2019 email the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

116.    Apple also recognizes that making Apple Watch compatible with Android would "remove [an] iPhone differentiator."

117.     Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

118.     The ability to respond to notifications like new messages or app alerts directly from a smartwatch is one of the top considerations for smartwatch purchasers—and one of the most used product features when it is available. According to Apple's own market research, the ability to "[s]end and receive text messages from social and messaging apps" is a critical feature for a smartwatch. In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third- party access to new and improved APIs for smartwatch functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party smartwatches access to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

119.     A reliable Bluetooth connection is essential for a smartwatch to connect wirelessly with a smartphone and thereby function as a companion to the user's smartphone to unlock its full functionality. But Apple prohibits third-party smartwatch developers from maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes that users frequently disable Bluetooth on their iPhone without realizing that doing so disconnects their watch. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch

with their iPhone. Apple also requires users to turn on "Background App Refresh" and disable the battery-saving "Low Power Mode" in their iPhone settings for third-party smartwatches to remain consistently connected to their companion app, which is necessary to allow a user's iPhone and their smartwatch to update and share data about the weather or exercise tracking, even though Apple does not impose similar requirements for Apple Watch.

120.    Cellular-enabled smartwatches incorporate the ability to connect directly to a cellular network, allowing users to make calls, send messages, and download data even if their smartwatch is not paired to a smartphone. Cellular-enabled smartwatches are popular with consumers, making up approximately 20 percent of Apple Watch sales. Apple Watch users can use the same phone number for their smartphone and smartwatch when connected to the cellular network. As a result, messages are delivered to both the user's smartphone and smartwatch, providing an integrated messaging experience. Although it is technologically feasible for Apple to allow an iPhone user with a third-party smartwatch to do the same, Apple instead requires these users to disable Apple's iMessage service on the iPhone in order to use the same phone number for both devices. This is an unacceptable non-starter for most iPhone users. In practice, iPhone users with a third-party smartwatch must maintain separate phone numbers for the two devices, worsening their user experience, and may miss out on receiving messages sent to their primary iPhone number.

### 3.    Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones.

121.    Apple recognizes that paying for products and services with a digital wallet will eventually become "something people do every day of their lives." But Apple has used its control over app creation, including its technical and contractual control over API access, to effectively block third-party developers from creating digital wallets on the iPhone with tap-to-pay functionality, which is an important feature of a digital wallet for smartphones. As a result, Apple maintains complete control over how users make tap-to-pay payments with their iPhone. Apple also deprives users of the benefits and innovations third-party wallets would provide so that it can protect "Apple's most important and successful business, iPhone."

35

122.   Digital wallets are apps that allow a user to store and use passes and credentials, including credit cards, personal identification, movie tickets, and car keys, in a single app. For example, digital wallets allow users to make in-person payments by tapping their device on a payment terminal rather than tapping or swiping a physical credit card. Digital wallets can also be used for transactions in mobile apps and mobile websites.

123.   Absent Apple's conduct, cross-platform digital wallets could also be used to manage and pay for subscriptions and in-app purchases.

124.   Apple Wallet is Apple's proprietary digital wallet on the iPhone. Apple Wallet incorporates Apple's proprietary payment system Apple Pay, which processes digital payments on the web, in apps, and at merchant points of sale.

125.   Today, Apple Wallet offers users a way to make these payments using their iPhone. But Apple envisions that Apple Wallet will ultimately supplant multiple functions of physical wallets to become a single app for shopping, digital keys, transit, identification, travel, entertainment, and more. As users rely on Apple Wallet for payments and beyond, it "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem" because Apple Wallet is only available on the iPhone. Thus, switching to a different smartphone requires leaving behind the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet.

126.   Cross-platform digital wallets would offer an easier, more seamless, and potentially more secure way for users to switch from the iPhone to another smartphone. For example, if third-party developers could create cross-platform wallets, users transitioning away from the iPhone could continue to use the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment contacts, and other information, making it easier to switch smartphones. And because many users already use apps created by their preferred financial institutions, if these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

127.    Accordingly, the absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone users to purchase a different smartphone.

128.    The most important function for attracting users to a digital wallet for smartphones is the ability to offer tap-to-pay, *i.e.*, the ability to make in-person payments by tapping your smartphone on a payment terminal. Apple uses its control over app creation and API access to selectively prohibit developers from accessing the near-field communication ("NFC") hardware needed to provide tap-to- pay through a digital wallet app.

129.    Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to-pay. While Apple actively encourages banks, merchants, and other parties to participate in Apple Wallet, Apple simultaneously exerts its smartphone monopoly to block these same partners from developing better payment products and services for iPhone users.

130.    Apple also uses its smartphone monopoly to extract payments from banks, which need to access customers that use digital wallets on iPhones. Since Apple first launched Apple Pay—long before it achieved meaningful adoption—Apple has charged issuing banks 15 basis points (0.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks. Apple's fees are a significant expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users. The volume of impacted transactions is large and growing. A U.S. Consumer Financial Protection Bureau report estimates that Apple Pay facilitated nearly $200 billion in transactions in the United States in 2022. And the report goes on to explain that "analysts estimate that the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

131.    Multiple app developers have sought direct NFC access for their payment or wallet apps. Yet Apple prohibits these developers from incorporating tap-to-pay functionality in their apps for fear that doing so would "be one way to disable [A]pple [P]ay trivially," leading to the "proliferation of other payment apps" that might operate cross-platform and ultimately undermine Apple's smartphone monopoly.

132.    There is no technical limitation on providing NFC access to developers seeking to offer third-party wallets. For example, Apple allows merchants to use the iPhone's NFC antenna to

accept tap-to-pay payments from consumers. Apple also acknowledges it is technically feasible to enable an iPhone user to set another app (*e.g.*, a bank's app) as the default payment app, and Apple intends to allow this functionality in Europe.

133.    Apple further impedes the adoption of digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages. By limiting the ability of third-party wallets to provide a simple, fast, and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets.

134.    Apple also blocks other digital wallets from serving as an alternative to Apple's in-app payment in app payment. This prevents these wallets from increasing their attractiveness and improving the overall user experience on the iPhone by offering consumer experiences that may include use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods. Apple even prohibits developers on its App Store from notifying users in the developer's app that cheaper prices for services are available using alternative digital wallets or direct payments.

135.    Apple's conduct reflects its knowing degradation of the experience of its own users by blocking them from accessing wallets that would have better or different features. In so doing, Apple cements reliance on the iPhone and also imposes fees on a large and critical slice of all digital wallet NFC transactions, which the U.S. Consumer Financial Protection Bureau estimates will grow to $451 billion by 2028.

136.    Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services.

137.    The exclusionary and anticompetitive acts described above are part of Apple's ongoing course of conduct to build and maintain its smartphone monopoly. They are hardly exhaustive. Rather, they exemplify the innovation Apple has stifled and Apple's overall strategy of using its power over app distribution and app creation to selectively block threatening innovations.

138.    Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware, facilitate switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling

the development of cross-platform technologies. For instance, Apple has undermined third-party location trackable devices that fully function across platforms. Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime. Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit. Protocols that Apple has placed around new "eSIM" technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number. Apple has impeded cross-platform cloud storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult. Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones. And Apple has worsened its users' experience by making it difficult for iPhone users to use superior voice and AI assistants and steering users to use Siri as a voice assistant.

139. Ultimately, the strategies Apple has employed to date are not the only ones Apple can use to achieve its anticompetitive and lucrative ends. As technology evolves, Apple continues to evolve and shift its anticompetitive behavior to protect its monopoly power. For example, in recent years, Apple has increasingly moved into offering its own subscription services, including news, games, video, music, cloud storage, and fitness subscriptions that could be used to keep users tethered to the platform. These subscription services and other ancillary fees are a significant part of Apple's net revenue. These subscriptions services can also increase switching costs among iPhone users. If an Apple user can only access their subscription service on an iPhone, they may experience significant costs, time, lost content, and other frictions if they attempt to switch to a non-Apple smartphone or subscription service.

140. These subscription services can also increase Apple's power over content creators and newspapers, among others, by exerting control over how audiences access their work, decreasing traffic to their websites and apps, and positioning Apple as the middleman or tollbooth operator in the relationship between creators and users. In so doing, Apple takes on outsize importance and control in the creative economy, which may diminish incentives to fund, make, and distribute artistic expression.

141.    In addition, when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple reportedly allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app.

142.    Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers. For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well. The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car. At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct.

143.    Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone. Apple's smartphone dominance extends to CarPlay, an Apple infotainment system that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car. Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. After leveraging its smartphone dominance to car infotainment systems, Apple has told automakers that the next generation of Apple CarPlay will take over all of the screens, sensors, and gauges in a car, forcing users to experience driving as an iPhone-centric experience if they want to use any of the features provided by CarPlay. Here too, Apple leverages its iPhone user base to exert more power over its trading partners, including American carmakers, in future innovation. By applying the same playbook of restrictions to CarPlay, Apple further locks-in the power of the iPhone by preventing the development of other disintermediating technologies that interoperate with the phone but reside off device.

1    **VII.    ANTICOMPETITIVE EFFECTS**

2         **A.    Apple's conduct harms the competitive process and injures iPhone
3               purchasers.**

4         144.    As described above, Apple protects its monopoly power in smartphones and

5    performance smartphones by using its control over app distribution and app creation to suppress or

6    delay apps, innovations, and technologies that would reduce user switching costs or simply allow

7    users to discover, purchase, and use their own apps and content without having to rely on Apple.

8    As a result, Apple faces less competition from rival smartphones and less competitive pressure

9    from innovative, cross-platform technologies not because Apple makes its own products better but

10   because it makes other products worse. With the benefit of less competition, Apple extracts

11   extraordinary profits and regulates innovation to serve its interests. This leaves all smartphone users

12   worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and

13   accessories, and less innovation from Apple and others. Left unchallenged, Apple will continue to

14   use and strengthen its smartphone monopoly to dictate how companies can create and distribute

15   apps in the future so that they cannot threaten Apple's smartphone monopolies.

16        145.    Apple's conduct has resulted in less choice for smartphone users. Today, only two

17   companies (Google and Samsung) remain as meaningful competitors to Apple in the premium

18   smartphone market.

19        146.    Even when users consider these alternatives, Apple's conduct has increased the

20   technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative

21   smartphone. This undermines competition and entrenches Apple's monopoly power. For example,

22   according to user surveys, one of the biggest reasons iPhone users do not switch to rival

23   smartphones today is to avoid the problems Apple has created for cross-platform messaging.

24   Likewise, Apple exercised its control over app distribution and app creation to impede the

25   development and growth of super apps, depriving users of technology that would have facilitated

26   switching by decreasing user's dependence on Apple and the iPhone. Apple took a similar approach

27   to cloud streaming apps, delaying or suppressing technology that would have made it easier for

28   users to switch to cheaper smartphones. Apple also used its control over app creation, including its

1    control over critical APIs, to impose technical and contractual restrictions on messaging apps, third-

2    party smartwatches, and digital wallets, undermining cross-platform technologies that would have

3    helped users overcome switching costs and friction and ultimately increased smartphone

4    competition.

5         147.    Apple's conduct has delayed or suppressed the emergence of cross-platform

6    technologies that would put competitive pressure on Apple's ability to extract extraordinary profits

7    from users and developers. For example, if developers could distribute their programs through

8    super apps or cloud streaming apps, rather than the App Store, it would put competitive pressure

9    on Apple's ability to control app distribution and app creation as well as the taxes Apple imposes

10   on developers who want to distribute apps to iPhone users. Similarly, third-party digital wallets, or

11   other apps with tap-to-pay functionality, would benefit users and developers by putting more

12   competitive pressure on Apple as well. For example, digital wallets could eventually provide

13   developers an alternative way to process payments and manage customer relationships, forcing

14   Apple to compete more aggressively by lowering fees and improving quality, which would

15   ultimately benefit users. Instead, Apple continues to exert its power over customers and financial

16   institutions when users pay for something with their phone—in the App Store, in an app, or

17   increasingly in the physical world with tap-to-pay.

18        148.    Apple's conduct has harmed users in other ways. For example, third-party digital

19   wallets would reduce Apple's ability to charge banks high fees when users make payments using

20   Apple Wallet, which ultimately cost consumers through higher prices or other reductions in quality.

21   Alternative digital wallets could also provide smartphone users better rewards, *e.g.*, cash back, as

22   well as a more private, secure payment experience from a user's preferred financial institution

23   rather than being forced to go through Apple. But these tap-to-pay digital wallet products and

24   services do not exist today because of Apple.

25        149.    Apple's conduct has also made its own products worse, sacrificing the short-term

26   profits Apple could earn from improving the iPhone in order to preserve the long-term value of

27   maintaining its monopoly. In a competitive market, Apple would compete aggressively to support

28   the development of popular apps and accessories for iPhone users, which would in turn make

42

iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud streaming apps, because of the threat they pose to Apple's smartphone monopolies. As a result, several developers have abandoned plans to develop super apps and cloud-based gaming apps even after making substantial investments in bringing them to market. Apple's conduct may have also slowed the development of innovative, high-compute apps related to education, artificial intelligence, and productivity as well. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

150.    Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

151.    According to the DOJ's Complaint, Apple's documents and conduct show that Apple is motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets. For example, Apple sacrificed substantial revenues it could have earned from super apps, mini programs, cloud streaming apps, and other third-party apps and accessories. In

particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud streamed gaming apps would offer iPhone users access to popular services (including games) and in turn generate significant revenue for Apple through subscriptions and in-app purchases. Instead, Apple preferred the long-term benefit of reduced smartphone competition to the revenue it would generate from cloud gaming, super apps, and mini programs or the quality (and consumer demand) increase that would flow from this innovation. Apple has also used its control over app distribution and app creation to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

152.    The harms to smartphone competition caused by Apple's conduct are amplified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple ran its App Store the same way it does today. Apple does not allow that choice, however, because if it did developers could write their programs for any smartphone rather than specifically for iOS, just as internet browsers and Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems not just Windows. That would lower users' switching costs and reduce users' and developers' dependence on Apple and the iPhone.

153.    Apple's smartphone monopoly gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple is forced to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. For example, Apple has stated plans to adopt RCS due to market and international regulatory pressure. But Apple continues to contractually restrict third parties from accessing other APIs and features that would enable cross-platform messaging apps. In another instance, Apple was enjoined from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different

set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force companies to comply with Apple's policies that may contradict local laws by delaying the review of the offending companies' apps.

154.    Apple's conduct has therefore harmed Plaintiff and other iPhone purchasers in myriad ways. iPhone prices have increased dramatically and now, on an inflation-adjusted basis, far exceed the prices that iPhones commanded when Apple initially sought to displace BlackBerry devices and other pre-smartphone devices. Those price increases reflect Apple's acquisition and maintenance of monopoly power, and the difference between the prices Plaintiff and other purchasers of iPhones from Apple paid and what they would have paid had Apple competed on the merits instead of engaging in anticompetitive conduct represent "overcharges"—monies that should have remained in purchasers' pockets but instead went to Apple's coffers.

155.    In addition to overcharges, iPhone purchasers have suffered from reduced choice, slower innovation, and a degraded user experience relative to what they would have enjoyed in a competitive market. All of these harms together and separately reflect precisely the type of injuries that the antitrust laws were intended to prevent, and iPhone purchasers are therefore entitled to treble damages and injunctive relief to remedy past harms and prevent future injuries from Apple's conduct.

**B.      Apple has every incentive to use its monopoly playbook in the future.**

156.    Apple's conduct does not just impact the past and present but poses significant risk to the development of new innovations. Apple may use its smartphone monopoly playbook to acquire or maintain power over next-frontier devices and technologies. As Apple grows its dominance, Apple may continue delaying or stifling the innovations of cross-platform companies, in order to lock users into Apple devices.

157.    Apple has countless products and services—AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash. These provide future avenues for Apple to engage in anticompetitive conduct and the ability to circumvent remedies. Appropriate forward-looking remedies are necessary to ensure that Apple cannot use these products and services to further entrench its monopoly power.

158.    Apple's conduct extends beyond just monopoly profits and even affects the flow of speech. For example, Apple is rapidly expanding its role as a TV and movie producer and has exercised that role to control content.

159.    Apple has also attempted to use its monopoly to collect user data and stifle innovation in the automotive industry by, among other things, impeding the development of digital key technologies by requiring them to be offered in Apple's proprietary wallet product and creating new single points of power over emerging uses of the iPhone. These acts further reinforce Apple's power in the iPhone by locking in Apple's services and excluding other alternative technologies that have the potential to disintermediate Apple's iPhone.

160.    Finally, Apple's monopolization of smartphone markets gives it tremendous power over the lives of millions of Americans. Today, Apple uses that power to undermine rival smartphones, suppress innovative technologies, and stymie consumer choice. Tomorrow, Apple may use its power to force its own users (and their data) to become its next profitable product.

## VIII.    PRIVACY, SECURITY, AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT

161.    There are no valid, procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's moat building has not resulted in lower prices, higher output, improved innovation, or a better user experience for smartphone users.

162.    Apple markets itself on the basis of privacy and security to differentiate itself from what competition is left in the smartphone market. But this does not justify Apple's monopolistic and anticompetitive conduct. Apple imposes contractual restraints on app creation and distribution, imposes hefty fees on many types of smartphone interactions, and conditionally restricts API access on its smartphone platform simply because it can. There are limited if any competitive constraints on this conduct. As a point of comparison, Apple does not engage in such conduct on its Mac laptops and computers. It gives developers the freedom to distribute software directly to consumers on Mac without going through an Apple-controlled app store and without paying Apple app store fees. This still provides a safe and secure experience for Mac users, demonstrating that Apple's

control over app distribution and creation on the iPhone is substantially more restrictive than necessary to protect user privacy and security.

163.    In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. In particular, when an iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in a process that could otherwise occur directly between the user and card issuer introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more curated selection of apps that better protect user privacy and security. Indeed, Apple allows enterprise and public sector customers to offer more curated app stores on employee iPhones because it better protects privacy and security.

164.    Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's conduct. If Apple wanted to, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users.

165.    Similarly, Apple is willing to sacrifice user privacy and security in other ways so long as doing so benefits Apple. For example, Apple allows developers to distribute apps through its App Store that collect vast amounts of personal and sensitive data about users—including children—at the expense of its users' privacy and security. Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts massive payments from Google to set its search engine as the default in the Safari web browser even though Apple recognizes that other search engines better protect user privacy.

166.    Finally, Apple selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits

developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

167.    Ultimately, Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help Apple protect its monopoly power. Apple's conduct underscores the pretextual nature of any claim that Apple's conduct is justified by protecting user privacy or security.

## IX.    THE SMARTPHONE INDUSTRY AND RELEVANT MARKETS

### A.    Background.

168.    Mobile phones are portable devices that enable communications over radio frequencies instead of telephone landlines. These signals are transmitted by equipment covering distinct geographic areas, or "cells," which is why mobile phones were called cell phones. The first commercial cell phones became available in the 1980s. Since then, improvements in both cell phone components and wireless technology have made it possible to transfer large volumes of data around the globe in a short period. As a result, mobile phones began to offer a wider array of features and the adoption of mobile phones dramatically increased. Today, nearly all American adults own a mobile phone.

169.    Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. Smartphones not only make phone calls, but allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet. Consumers choose between smartphones based, in part, on their functionality. Today, smartphone functionality is driven in large part, though not exclusively, by a combination of hardware and software components. Thus, in a competitive market, smartphone manufacturers would compete and innovate to provide the best functionality.

170.    Although consumers could replace some smartphone functionality with separate devices such as by always carrying a camera and laptop, they generally prefer to access this combination of functionality as part of a single device. Thus, phones with some but not all of these features are not reasonable substitutes for smartphones. For example, a Canon or Nikon camera is

not a substitute for an Apple or Samsung smartphone notwithstanding that both these products are capable of taking digital pictures.

171.   Smartphones can be purchased directly from manufacturers, like Apple or Samsung. They can also be purchased or leased through third-party cellular service carriers, such as Verizon or AT&T. Finally, they can be purchased from third-party retailers (*e.g.*, Wal-Mart and Best Buy).

172.   In the United States, 20% or more of all iPhone purchases are direct through Apple, either in its retail spaces or online. Approximately 60-75% of all U.S. iPhone purchases are completed through a third-party cellular service carrier, like Verizon or AT&T, with the remainder purchased through third-party retailers, like Wal-Mart and Best Buy.

**B.   Smartphone Hardware.**

173.   A smartphone's hardware includes the frame and screen. Higher performing smartphones are typically constructed from better materials like glass and metal instead of plastic, manufactured to higher standards that make them more durable (*e.g.*, water and dust proof), and have higher quality displays.

174.   A smartphone's hardware also includes the semiconductor chipsets that run the smartphone: central processing of software instructions, graphics, video, display, memory, data storage, and connection to wireless networks. Chipsets that offer superior performance—faster processing and network connections, better graphics, more storage—are costly. As a result, smartphone manufacturers typically include them only in more expensive performance smartphones.

175.   Smartphone hardware includes other important components like cameras, and position and motion sensors. Performance smartphones typically have higher quality cameras, better battery life, wireless charging, and advanced biometrics such as face scanning.

176.   Smartphones also contain several types of antennas that allow the phone to communicate with other smartphones, accessories, or other devices using standard communication protocols such as Wi-Fi, Bluetooth, and Near-Field Communications (NFC):

- Wi-Fi is a wireless networking technology that uses radio waves to provide wireless high-speed Internet access through mobile devices, computers, printers, and other equipment. "Wi-Fi," in particular, refers to IEEE 802.11 standards that define the

49

protocols that enable communications with current Wi-Fi-enabled wireless devices such as wireless routers and access points.

- Bluetooth is a wireless standard that allows smartphones to use shortwave radios to communicate with accessories like headphones and smartwatches. An industry-wide Bluetooth standard specifies technological requirements to ensure that all Bluetooth devices can recognize and interact with each other. A typical Bluetooth signal has a range of about 30 feet.

- Near Field Communication (NFC) allows smartphones to interact with NFC-enabled devices like a credit card terminal at a coffee shop. NFC relies on short-range wireless technologies, including radio signals, to communicate and share information. To operate, two NFC-enabled devices must typically be within four centimeters or less of one another.

177.   Three device manufacturers, Apple, Samsung, and Google, account for approximately 94 percent of all smartphones by revenue in the United States. Apple and Samsung alone account for approximately 90 percent of all smartphone revenues in the United States.

178.   Cloud-based technologies are run using hardware and software in remote computing centers ("the cloud") rather than by hardware and software on a smartphone. The user experiences the technology on the phone but the complex computing that generates the rich experience and that executes the user's commands happens in the cloud. Thus, cloud apps can deliver rich experiences on smartphones with less capable hardware than iPhones currently contain.

**C.   Smartphone Operating Systems, Applications, and Other Software.**

179.   In addition to hardware, smartphones include various software components that make a smartphone more attractive to users.

180.   The most important software component is a smartphone's operating system, the foundational software that manages both the hardware and other software programs on the device. All iPhones are preloaded with Apple's proprietary, exclusive iPhone operating system called iOS. The only other significant mobile operating system in the United States is Google's Android, which works with smartphones manufactured by Samsung, whose U.S. headquarters is located in this district, Google, Motorola, and smaller players. Software applications, known as "apps," are programs that perform specific tasks at the smartphone user's request, such as sending messages, playing music, or web browsing. Apps depend on a smartphone's operating system to function. For example, to make a video call, apps must communicate with a smartphone's operating system to

access various hardware components on the phone, such as the camera, microphone, and speaker. Apps communicate with a smartphone's operating system through application programming interfaces (APIs).

181.   Apps that work with a particular smartphone operating system are called native apps. Thus, Apple's native iOS apps work with iPhone and native Android apps work with Android smartphones.

182.   Most app developers do not view Android as a substitute for iOS or iOS as a substitute for Android. The overwhelming majority of users choose a single phone and do not "multi-home" by carrying an Android phone and the iPhone at the same time. Thus, a developer cannot reach iPhone users on Android or Android users on iPhones. Due to the lack of user multi-homing, most developers create native apps for both iOS and Android to reach the greatest number of smartphone users. For example, a food delivery or ride-sharing app cannot develop an app just for Android phones or just for the iPhone. Developing for both platforms is often necessary for developers to reach the scale they need to be viable.

183.   It is also important to develop apps for the iPhone and other smartphone platforms because most apps are increasingly "social" in nature and require users on one platform to reach users on the other. For example, the developer of a dating app must enable its users on iPhones to meet users on Android and vice-versa. A money-sharing app must enable users on Android devices to send money to users on iPhones and vice versa.

184.   App developers typically provide a similar user experience for native apps on iPhones and Android smartphones to minimize the resources and risks of maintaining different features across different smartphones. Even so, developers must program native apps to work with a specific operating system and so they do not always interoperate or synchronize across different operating systems.

185.   Middleware is software that provides similar APIs and functionality across a diverse set of operating systems and devices. This allows developers to create cross-platform applications without having to write separate code for individual operating systems or devices because developers can rely on the APIs exposed by the middleware rather than APIs that only work on

specific operating systems or devices. Apple has long understood how middleware can help promote competition and its myriad benefits, including increased innovation and output, by increasing scale and interoperability. As Avadis Tevanian, Apple's then-Senior Vice President of Software Engineering testified during the government's landmark monopolization case in *United States v. Microsoft*: "Because we have created QuickTime for both Windows and Macintosh computers, developers can write a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems." In the context of smartphones, examples of middleware include internet browsers, internet or cloud-based apps, super apps, and smartwatches, among other products and services. While not meeting the technical definition of middleware, certain other products and services may nonetheless have the same economic impact as middleware, such as eliminating the added expense of porting a product or experience across hardware or operating systems. For the purposes of this complaint middleware refers to both technical middleware and to products and services that, while not technically middleware, have the same economic effect.

**D.    Relevant Markets**

186.    Apple has monopoly power in the market for performance smartphones. The market for performance smartphones is the appropriate market because market participants, including Apple, do not consider entry level smartphones competitors to performance smartphones. All smartphones compete against each other in a broad relevant market. But industry participants, including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a narrower market that excludes this tier. Regardless of how the market is drawn, however, Apple's conduct is unlawful.

**1.    Performance smartphones are a relevant product market.**

187.    Performance smartphones are a narrower relevant product market within the broader smartphone market. This narrower market includes those smartphones that compete with most

iPhones and excludes the lowest-end smartphones, which industry participants sometimes refer to as "entry- level" smartphones.

188.    Industry participants recognize performance smartphones as distinct and frequently group smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship."

189.    Apple has also long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. According to the DOJ's Complaint, Apple's own documents indicate it does not view entry-level smartphones as competing with the iPhone and other performance smartphones.

190.    Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (*e.g.*, plastic instead of metal and glass). They have lower-performance components such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

191.    Because of these differences, among others, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones.

192.    Moreover, competition from non-performance smartphones is not sufficient today to prevent Apple from exercising monopoly power in the performance smartphone market.

**2.    Smartphones are a broader relevant product market.**

193.    Smartphones are a relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer displays,

less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

194.    Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

195.    Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

196.    Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

       **3.**     **The United States is a relevant geographic market for performance smartphones and smartphones.**

197.    The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the United States demand services offered by U.S. telecommunications companies when they purchase a smartphone. While Apple sells smartphones worldwide, its users are still geographically limited. Most consumers in the market for Performance smartphones uses their phones in the U.S. Consumers who purchase a smartphone require a service plan with a U.S. telecommunications company in order to connect the phone to cellular and mobile networks.

198.    Finally, potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some international smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

199.    Consumers in the United States could not avoid or defeat an increase in the price of performance smartphones or smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those

in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China than they do in the United States due to less competition.

**E.      Apple has monopoly power in the smartphone and performance smartphone markets.**

200.   Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

201.   In the U.S. market for performance smartphones, where Apple views itself as competing, Apple estimates its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones—including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones—Apple's share is more than 65 percent by revenue. Similarly, even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones—especially performance smartphones that run sophisticated apps.

202.    Apple's power over developers, in turn, further locks in iPhone purchasers to Apple's ecosystem by limiting users' ability to transfer their apps and data to non-Apple devices, making it difficult for users to switch away from Apple devices to avoid monopolistic overcharges. And as existing iPhone users get increasingly locked in, new smartphone buyers find other smartphones less and less viable as substitutes for iPhones because purchasing an iPhone allows them to interact more seamlessly with their friends and family who already have iPhones. This snowballing effect means, for example, that nearly 90% of teenagers expect their first smartphone purchases to be iPhones, thus ensuring that the next generation of users will similarly become locked into Apple's ecosystem. So any theoretical cross-elasticity of demand between iPhones and other smartphones does not suffice to prevent Apple from imposing monopolistic prices on iPhone purchasers.

203.    Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

204.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smartphones. This barrier is increasingly impenetrable. Nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. At least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

205.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and

56

specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service. Because smartphones are bought through mobile carriers including Verizon, which has its operations headquarters in this district, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

206.    Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (*e.g.*, contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, APIs, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the "stickiness" of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

207.    Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. Past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

208.     Apple's monopoly power is separately demonstrated by direct indicia. For example, Apple can and does profitably forego innovation without fear of losing customers to competitors. For example, Apple's vice president of iPhone marketing explained in February 2020: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."

209.     Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers—as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1 billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau suggests these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

210.     Apple increasingly charges developers additional fees to promote their apps in the App Store as well. In fact, this is one of the fastest-growing parts of Apple's services business, with revenue "increasing by more than a third to $4.4B in FY 2022."

211.     These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

CLASS ACTION COMPLAINT

1    **X.    CLASS ACTION ALLEGATIONS**

2        212.    This suit is brought as a class action pursuant to Section 382 of the California Code

3    of Civil Procedure, on behalf of a class as follows:

4           All persons and entities who are citizens of the State of California
            and who purchased one or more iPhones other than for resale or
5           distribution during the Class Period.

6        213.    Based upon the nature of the trade and commerce involved Plaintiff believes that

7    the total number of Class members is in the thousands, and that Class members are geographically

8    dispersed throughout the State of California. Therefore, joinder of all members of the Class is not

9    practicable.

10       214.    There are questions of law and fact common to the Class which predominate over

11   any questions which may affect only individual members of the Class, including, but not limited

12   to:

13           a.    The nature and extent of Apple's conduct;

14           b.    Whether Apple's conduct violated California Business and Professions Code

15                 section 16720 of the Cartwright Act;

16           c.    Whether Apple's conduct violated California Business and Professions Code

17                 section 16727 of the Cartwright Act;

18           d.    Whether Apple's conduct violated California Business and Professions Code

19                 section 17200;

20           e.    Whether Apple's conduct injured Plaintiff's and Class members' business

21                 and property;

22           f.    Whether Apple was unjustly enriched by selling its iPhone at prices inflated

23                 by its unlawful conduct; and

24           g.    The type and/or measure of damages Plaintiff's and Class members suffered

25                 as a result of Apple's conduct.

26       215.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's

27   claims are typical and representative of the claims of all members of the Class, all of whom

28   purchased iPhones for use and not for resale.

216.    There are no defenses of a unique nature which may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiff is a typical purchaser of iPhones, does not have any interest which is in conflict with or is antagonistic to the members of the Class, and has no conflict with any other member of the Class. Plaintiff has retained competent counsel experienced in class-action antitrust litigation to represent him and the Class.

217.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. In the absence of a class action, Defendant will retain the benefits of its wrongful conduct.

## XI.    ANTITRUST INJRY

218.    During the Class Period, Plaintiff and members of the Class purchased iPhones. Because of Defendant's anticompetitive conduct, Plaintiff and members of the Class were forced to pay more for iPhones than they would have if Defendant had not engaged in the unlawful activity this action seeks to remedy. Defendant therefore has caused Plaintiff and Class members to suffer overcharge damages. Because of Defendant's continuing conduct in using its market power, contractual restrictions, fees, and API restrictions, Plaintiff and members of the Class are reasonably likely to incur future overcharges for iPhones. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of law, as alleged herein.

219.    Defendant, through its unlawful conduct alleged herein, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges. Plaintiff and members of the Class have sustained, and continue to sustain, significant losses in the form of artificially inflated prices caused by Defendant's anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Defendant's anticompetitive conduct is stopped, Plaintiff and the Class will incur future overcharges in their direct purchases of iPhones.

**FIRST CAUSE OF ACTION**

[Violation of Cal. Bus. & Prof. Code § 16720, *et seq.* (Cartwright Act)]

220.    Plaintiff incorporates, as though fully set forth herein, each and every paragraph set forth above.

221.    Defendant's conduct as alleged in this Complaint violates Cal. Bus. & Prof. Code Section 16720, *et seq.*, commonly called the Cartwright Act. As alleged in this Complaint, Plaintiff and the members of the Class have been injured in their business and property as a result of the Defendant's violation of Section 16720 of the California Business and Professions Code, for which they seek treble damages pursuant to Section 16750, subdivision (a) of that Act. As a proximate result of the Defendant's conduct, Plaintiff and the Class they represent have been damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

[Violations of Cal. Bus. & Prof. Code § 16727 (Cartwright Act)]

222.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

223.    Defendant's conduct as alleged in this Complaint further violates Cal. Bus. & Prof. Code Section 16727. Such conduct included, but is not limited to, making sales or contracts for the sale of goods or merchandise, or to fix a price thereof, discount from, or rebate upon such price on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods or merchandise of a competitor, where the effect of such arrangement may be to (and was) to substantially lessen competition or tend to create a monopoly in the trade of iPhones in California.

224.    For the purpose of restraining trade and maintaining and profiting from its monopoly, Apple has engaged in unlawful acts, including but in no way limited to the acts, practices and course of conduct set forth above.

225.    Apple's behavior alleged herein has had, *inter alia*, the following effects:

        a.    Price competition in the sale of iPhones has been restrained, suppressed and/or eliminated in the State of California;

1            b.     Prices for iPhones sold by Defendant and its co-conspirators have been

2                  fixed, raised, maintained and stabilized at artificially high, noncompetitive

3                  levels in the State of California; and

4            c.     Those who purchased iPhones in the State of California have been deprived

5                  of the benefit of free and open competition.

6        226.    Plaintiff and the other members of the Class paid supra-competitive, artificially

7    inflated prices for iPhones.

8    **THIRD CAUSE OF ACTION**

9    [Violations of Cal. Bus. & Prof. Code § 17200 (Unfair Competition Act)]

10        227.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

11    allegation set forth in the preceding paragraphs of this Complaint.

12        228.    This Complaint is filed and these proceedings are instituted pursuant to sections

13    17203 and 17204 of the California Business and Professions Code, to obtain restitution,

14    disgorgement, and other available remedies from Defendant for acts and business practices, as

15    alleged herein, in violation of section 17200 of the California Business and Professions Code,

16    commonly known as the Unfair Competition Act.

17        229.    The conduct alleged herein violates California Business and Professions Code

18    section 17200. The acts and business practices, as alleged herein, constituted and constitute a

19    common, continuous, and continuing course of conduct of unfair competition by means of unfair,

20    unlawful and/or fraudulent business acts or practices within the meaning of California Business

21    and Professions Code section 17200, *et seq.*, including, but in no way limited to, the following:

22            a.     Apple's acts and business practices as described above constitute violations

23                  of California Business and Professions Code section 16720, *et seq.*, as set

24                  forth above;

25            b.     Apple's acts and business practices as described above constitute violations

26                  of California Business and Professions Code section 16727, *et seq.*, as set

27                  forth above; and

28

c.      Apple's acts and business practices as described above, whether or not in violation of California Business and Professions Code sections 16720 or 16727, *et seq.*, are otherwise unfair, unconscionable, unlawful and/or fraudulent within the meaning of California Business and Professions Code section 17200.

230.    Plaintiff and the other members of the Class are each entitled to full restitution or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Apple as a result of such business acts or practices.

231.    The illegal conduct alleged herein is continuing and there is no indication that Apple will not continue such activity into the future.

**FOURTH CAUSE OF ACTION**

[Unjust Enrichment]

232.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

233.    Defendant has been unjustly enriched through overpayments by Plaintiff and Class members.

234.    Under common law principles of unjust enrichment, Defendant should not be permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

235.    Plaintiff seeks disgorgement of all overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, pray for judgment against the Defendant as follows:

1.      Determining that this action may proceed and be maintained as a class action and that Plaintiff be certified as the Class representative;

2.      That the unlawful trust, combination, agreement, and course of conduct alleged herein be adjudged and decreed to be a violation of section 16720 of the California Business and

Professions Code, and that Plaintiff and the other members of the Class have been injured and damaged as a result of Defendant's violation of the Cartwright Act;

       3.      That Defendant's conduct tended to lessen competition, as alleged herein; that such conduct be adjudged and decreed to be a violation of section 16727 of the California Business and Professions Code, and that Plaintiff and the other members of the Class have been injured and damaged as a result of Defendant's violation of the Cartwright Act;

       4.      That Defendant be found to have engaged in unfair competition in violation of section 17200 of the California Business and Professions Code;

       5.      For damages according to proof at trial, and that such amount be trebled;

       6.      For reasonable attorneys' fees pursuant to Section 16750(a) of the Business and Professions Code;

       7.      For prejudgment interest at the highest legal rate, from and after the date of service of the Complaint in this action;

       8.      Ordering Defendant and their agents, servants, and employees, and all persons acting, directly or indirectly, in concert with them, to restore all funds to each member of the Class acquired by means of any act or practice declared by this Court to be unlawful or to constitute unfair competition under Sections 17200, *et seq.*, of the Business and Professions Code;

       9.      For costs of suit; and

       10.      That Plaintiff and the other members of the Class be granted such other and further relief as the nature of the case may require or as this Court deems just and proper.

## JURY TRIAL DEMANDED

       Plaintiff requests a jury trial on all matters so triable.

CLASS ACTION COMPLAINT

Dated: March 28, 2024

**KIRBY McINERNEY LLP**

By:     */s/ Robert J. Gralewski, Jr.*
Robert J. Gralewski, Jr.
BGralewski@kmllp.com
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
Facsimile: (858) 255-7772

David E. Kovel
DKovel@kmllp.com
250 Park Avenue, Suite 820
New York, NY 11077
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Attorneys for Plaintiff*

65